

**ORDERED in the Southern District of Florida on July 14, 2020.**

Scott M. Grossman, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

Luna Developments Group, LLC,                    Case No. 19-11169-SMG

      Debtor.                                    Chapter 11

_____/

Alan Barbee, as Liquidating Trustee,

      Plaintiff,

v.                                              Adv. No. 19-1742-SMG

Amerant Bank, National Association,

      Defendant.

_____/

**ORDER GRANTING MOTION TO DISMISS**
**AND DENYING MOTION TO AMEND COMPLAINT**

Under Florida's Uniform Fraudulent Transfer Act ("FUFTA"),[1] property encumbered by a valid lien is not an "asset" that can be fraudulently transferred. Yet in this adversary proceeding, the plaintiff seeks to avoid the creation of a pledged bank account established to receive and hold $5 million in proceeds already encumbered by a valid lien, as well as the later transfer of those proceeds to pay down a cross-collateralized loan. Because the transfers were of assets encumbered by a valid lien, no "assets" were transferred under FUFTA, and therefore there are no transfers to avoid. The plaintiff also seeks to hold the defendant bank liable for aiding and abetting an alleged breach of fiduciary duty by the debtor's principal. But the plaintiff fails to plausibly allege any breaches of fiduciary duty, let alone that the bank had actual knowledge or rendered substantial assistance in the commission of this alleged tort. In fact, the allegations show only that the bank acted in its own financial interest and in accordance with its own legal and contractual rights. Accordingly, for the reasons discussed in detail below, the complaint will be dismissed.

Finally, although specifically given the opportunity to amend its complaint to address the defendant's arguments in its motion to dismiss, the plaintiff elected to amend only to bolster allegations of standing and to add a request for attorneys' fees. The plaintiff failed to add any additional allegations regarding the legal or factual bases for the fraudulent transfer or aiding and abetting claims, but purported to reserve the right to amend further in response to this Court's ruling. As discussed in

---

[1] Fla. Stat. §§ 726.101, *et seq.*

more detail below, however, because the complaint fails to state a claim regardless of the plaintiff's standing, the Court need not adjudicate the standing argument. And, because legal issues are dispositive here, any further amendment of the complaint would prove futile. Accordingly, the motion to amend will also be denied. And because the motion to amend will be denied, dismissal of the complaint will be with prejudice.

## I.    Overview.

Plaintiff Alan Barbee, as Liquidating Trustee for Luna Developments Group, LLC,[2] has sued Amerant Bank, N.A.[3] to avoid and recover as alleged fraudulent transfers the creation of a pledged bank account to receive and hold cross-collateralized sale proceeds, and then the subsequent transfer of funds from that account to pay down the cross-collateralized obligations of an affiliated entity.[4] Luna also asserted a claim against Amerant for alleged aiding and abetting breach of fiduciary duty by Luna's principal, Juan Arcila.

---

[2] At the time the Complaint was filed, Mr. Barbee was serving as a state-court appointed receiver, excused from turnover in this bankruptcy case under 11 U.S.C. § 543. Although Amerant has challenged Mr. Barbee's standing, as discussed in section IV.A., *infra*, the Court need not adjudicate the standing issue and will assume, without deciding, that the Complaint was brought by Luna as debtor-in-possession operated by Mr. Barbee. Since the filing of the Complaint, the Court has confirmed a chapter 11 plan of liquidation for Luna, which vested in a liquidating trust all claims and causes of action of Luna or its estate, with Mr. Barbee as Liquidating Trustee. (ECF No. 36). Accordingly, on July 9, 2020, the Court entered an order substituting Alan Barbee as Liquidating Trustee, as the plaintiff. (ECF No. 37). For ease of reference, the Court will refer to the plaintiff as "Luna" throughout this Order.

[3] During most times relevant to this adversary proceeding, Amerant Bank, N.A. was known as Mercantil Commercebank, N.A., But for ease of reference, the Court will refer to the defendant as "Amerant" throughout this Order.

[4] *Complaint to Avoid and Recover Fraudulent Transfers and for Aiding and Abetting a Breach of Fiduciary Duty* (ECF No. 1) (the "Complaint").

Amerant moved to dismiss the Complaint for failure to state a claim upon which relief may be granted,[5] asserting five principal arguments. First, Amerant argues that there were no avoidable transfers because the alleged transfers were not of "assets" (as that term is defined in FUFTA), as the assets allegedly transferred were at all times encumbered by valid liens. Second, Amerant argues that Luna's action is really a veiled attempt to seek avoidance of the cross-collateral lien created in 2007, but that a claim to avoid that transfer is barred by the statute of repose because it was created well more than four years before Luna's petition date. Third, Amerant argues that a receiver excused from turnover lacks standing to assert these claims, and any claim the receiver could otherwise assert is barred by the statute of repose. Fourth, Amerant argues that Luna provided reasonably equivalent value in exchange for the transfers. And lastly, Amerant argues the Complaint fails to plausibly allege a claim for aiding and abetting breach of fiduciary duty.

In response, Luna contends that Amerant released its original cross-collateral lien and that the creation of the new pledged account therefore was a transfer subject to avoidance. Luna then argues that Mr. Barbee, as a receiver excused from turnover, has standing (and therefore his claims are not time-barred) because he has been granted the rights, powers, and duties of a debtor-in-possession and is bringing these claims in that capacity. Next, Luna asserts that the issue of reasonably equivalent value is a question of fact that cannot be resolved on a motion to dismiss. And finally,

---

[5] *Motion to Dismiss Adversary Proceeding* (ECF No. 9) (the "Motion to Dismiss").

Luna argues that it adequately pleaded knowledge and substantial assistance with respect to its aiding and abetting breach of fiduciary claims.

Although Luna contends its Complaint plausibly stated claims for relief as pleaded, Luna also moved for leave to amend the Complaint to bolster allegations that the claims are being asserted on behalf of Luna, as a debtor-in-possession. The proposed amended complaint also adds a request for attorneys' fees and costs pursuant to Florida Statute § 56.29(9). Other than to bolster allegations of standing and to add a request for attorneys' fees and costs, the proposed amended complaint contains no new material allegations.

Upon consideration of the Complaint, the Motion to Dismiss, the *Response in Opposition*[6] (the "Response"), the *Motion for Leave to File First Amended Complaint*[7] (the "Motion to Amend"), the proposed First Amended Complaint attached thereto (the "Amended Complaint"), the *Memorandum in Opposition to Plaintiff's Motion to Amend,*[8] and the *Reply Memorandum in Support of the Motion to Dismiss,*[9] the Court will grant Amerant's Motion to Dismiss, dismiss the Complaint with prejudice, and deny the Motion to Amend for the reasons discussed below.

---

[6] ECF No. 21.

[7] ECF No. 22.

[8] ECF No. 30.

[9] ECF No. 31.

## II.    A Complaint Must Plausibly State a Claim for Relief.

To avoid dismissal, a complaint must state a claim for relief that is "plausible on its face."[10] The plaintiff must plead sufficient facts – which the court must accept as true at this stage[11] – to allow the court "to draw the reasonable inference"[12] of a defendant's liability. But allegations containing only "'labels and conclusions' or 'a formalistic recitation of the elements of a cause of action,'"[13] and "conclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts,"[14] will not suffice. If the "well-pleaded facts do not permit the court to infer more than the mere possibility" of liability, the complaint must be dismissed.[15]

In determining whether the well-pleaded facts state a claim for relief, the court generally may only consider the complaint and documents attached thereto.[16] The court must then determine, based on "judicial experience and common sense," whether the well-pleaded facts in the complaint present a plausible claim for relief.[17] But if the complaint's allegations fail to "nudge" the claims "across the line from conceivable to plausible," the court must dismiss the complaint.[18]

---

[10] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[11] *Iqbal*, 556 U.S. at 678.

[12] *Id.* (citing *Twombly*, 550 U.S. at 555-56).

[13] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[14] *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

[15] *Id.*

[16] *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997).

[17] *Iqbal*, 556 U.S. at 679.

[18] *Twombly*, 550 U.S. at 570.

III.    **Facts.**[19]

    A.    <u>The Luna Loan</u>.

Juan Arcila and Carlos Mahecha, through various entities, solicited investments to purchase and develop real property in South Florida.[20] They formed Luna in September 2006,[21] to purchase four rental apartment buildings in Hollywood, Florida (the "Luna Property") that Luna intended to convert to condominium units.[22] To finance this purchase, Luna borrowed $17.64 million (the "Luna Loan") from Amerant on November 29, 2006,[23] and gave Amerant a promissory note, along with a mortgage and security agreement encumbering the Luna Property (the "Luna Mortgage"), to secure the debt.[24] By November 1, 2007, Luna had converted a portion of the Luna Property into condominium units and made loan payments to Amerant, resulting in a partial release of the Luna Mortgage.[25] As of November 2007, Luna had repaid approximately $7 million of the Luna Loan.[26]

    B.    <u>Luna's Assets are Cross Collateralized to Secure BHQ's Financing.</u>

About a year after forming Luna, Mr. Arcila and Mr. Mahecha formed another real estate development company – Bal Harbour Quarzo, LLC ("BHQ") – to buy and

---

[19] For purposes of considering the Motion to Dismiss, the Court accepts the foregoing facts alleged by Luna in its Complaint as true.

[20] Compl. ¶ 11.

[21] *Id*. ¶ 12.

[22] *Id*. ¶ 14.

[23] *Id*. ¶ 13.

[24] *Id*. ¶ 13 & Ex. 1.

[25] *Id*. ¶ 15 & Ex. 2.

[26] *Id*. ¶ 16.

develop three properties in Bal Harbour, Florida (the "BHQ Properties"). As with the Luna Property, they also sought and obtained financing from Amerant for this project. As a condition of that financing, Amerant required the Luna Loan and the new BHQ loan to be cross-collateralized and cross-defaulted.[27]

On or about December 12, 2007, Amerant loaned BHQ $15.5 million (the "BHQ Loan")[28] to finance a portion of BHQ's acquisition of the BHQ Properties.[29] In connection with the BHQ Loan, Luna, BHQ, and Amerant executed a Cross-Collateral and Cross-Default Agreement (the "2007 Cross Collateral Agreement").[30] The 2007 Cross Collateral Agreement provided for the Luna security documents and collateral securing the Luna Loan to also secure the BHQ Loan, and for the BHQ security documents and collateral securing the BHQ Loan to also secure the Luna Loan.[31] Luna also executed a Collateral Assignment of Sales Contracts and Sales Proceeds ("Sales Proceeds Assignment")[32] in connection with the new BHQ Loan, which provided that Amerant would grant partial releases of its liens on the Luna Property to permit the sale of individual units, on the terms set forth in the Sales Proceeds Assignment.[33] Luna received no consideration in exchange for the liens it

---

[27] *Id*. ¶¶ 18-20 & Ex. 4.

[28] A partial copy of the Loan Agreement evidencing the BHQ Loan is attached to the Complaint as Exhibit 3, however that copy appears to be missing pages 2-5, 7-9, and 14 of the agreement. But, the fact that certain pages of the Loan Agreement appear missing is not material to the Court's analysis.

[29] Compl. ¶ 21.

[30] *Id*. ¶ 21 & Ex. 4.

[31] *Id*. ¶ 22; 2007 Cross Collateral Agreement, at 2.

[32] Compl. ¶ 23 & Ex. 5.

[33] *Id*.

granted to Amerant under the 2007 Cross Collateral Agreement and the Sales Proceeds Assignment.[34]

C.    The 2013 Loan Modifications.

Sometime during 2013, both Luna and BHQ became wholly-owned subsidiaries of Synergy Capital Group Holdings, LLC ("Synergy"), an entity owned and controlled by Mr. Arcila and Mr. Mahecha.[35] On July 30, 2013, Luna, BHQ, and Amerant entered into a series of agreements modifying, amending, and extending the maturity of Luna's obligations under the Luna Loan.[36] Luna executed and delivered to Amerant a Consolidated, Amended and Restated Promissory Note in the amount of $7.5 million;[37] Luna and Amerant executed a Notice of Future Advance, Modification of Mortgage and Rents Assignment and Extension Agreement;[38] and Luna, BHQ, and Amerant executed an Amendment and Reaffirmation of Amended and Restated Cross-Collateral and Cross Default Agreement ("Final Cross Collateral Agreement").[39]

D.    Luna Sells the Luna Property and Funds the Pledged Account.

A little less than two years later, Luna found a buyer for the Luna Property – Eagle Management RE, LLC ("Eagle") – and entered into a purchase and sale

---

[34] *Id.* ¶ 24.

[35] *Id.* ¶ 25.

[36] *Id.* ¶ 26.

[37] *Id.*

[38] *Id.* ¶ 26 & Ex. 7.

[39] *Id.* ¶ 26 & Ex. 8.

agreement effective as of April 17, 2015.[40] Four days later, Luna informed Amerant about the potential sale of the Luna Property and inquired about treatment of the sale proceeds.[41] In response, Amerant requested various financial statements from Luna, Amerant, and Mr. Arcila.[42] Understandably, Eagle also requested confirmation that the Luna Property would be released from Amerant's liens upon the closing.[43] But because the Luna Property (along with its contracts, rents, and other collateral) secured both the Luna debt and the BHQ debt, Luna could not sell its property free and clear of these liens without either paying the entire debt of both entities in full or obtaining Amerant's consent.

Luna therefore had to discuss terms on which Amerant would release its liens on the real property being sold to Eagle. Specifically, Amerant and David Fernandez, the Chief Operating Officer of Synergy (which owned both Luna and BHQ at that time),[44] began discussing[45] the sale of the Luna Property, how to handle the cross-collateral lien that secured the BHQ debt, and whether that lien could be released.[46] Ultimately, Amerant and Luna agreed that the Luna Property could be sold and

---

[40] *Id.* ¶ 29.

[41] *Id.* ¶ 30.

[42] *Id.* ¶¶ 30-31 & Ex. 11.

[43] *Id.* ¶ 32 & Ex. 12.

[44] *Id.* ¶ 25.

[45] Mr. Fernandez asked if it was possible for Amerant to not reference in a letter to Eagle the cross-collateral lien securing the BHQ debt, and instead just state that the mortgage lien will be removed. If Amerant had to mention the cross-collateral lien, Mr. Fernandez requested that Amerant at least not disclose to Eagle the amount of the BHQ Loan. Compl. Ex. 12.

[46] Compl. ¶¶ 33-35.

released from Amerant's liens if Luna placed $5 million of the net sale proceeds (over and above the amount of the Luna debt) in a newly-created pledged account (the "Pledged Account") in Luna's name that would continue to secure the BHQ debt under the Final Cross Collateral Agreement. To effectuate this resolution, Amerant required Luna to execute new agreements to release the Luna Property from the Final Cross Collateral Agreement and the liens granted thereby, and to establish the Pledged Account.[47]

Thus, in connection with the impending sale of the Luna Property to Eagle, on June 29, 2015,[48] Amerant and Luna executed two agreements: an Agreement Regarding Collateral[49] and a Deposit Assignment Agreement.[50] Amerant also gave Luna a letter dated June 29, 2015 referencing the Luna Loan (the "June 29 Letter"), which stated:

> This will confirm that the Bank *will* satisfy or terminate (as appropriate) its mortgage, assignment of rents, and financing statement(s) securing the aforementioned loan *if and after* it receives, in immediately available funds, no later than July 15, 2015, all of the net closing proceeds in an amount not less than $12.3 million from the sale to Eagle Management RE, LLC (or its assignee) of the property described in Exhibit A hereto encumbered by those instruments.[51]

---

[47] Compl. ¶ 36.

[48] Luna alleges that it was insolvent as of this date, because its December 31, 2014 balance sheet showed its liabilities exceeded the value of its assets, and its only material asset was the Luna Property. *Id.* ¶ 42. Luna also alleges that the granting of the lien on the Pledged Account rendered Luna insolvent, leaving it without available unencumbered funds to satisfy its obligations to other creditors, which Luna alleges were not less than $3.275 million. *Id.* ¶ 41.

[49] Compl. ¶ 37 & Ex. 14.

[50] *Id.* ¶ 37 & Ex. 15.

[51] *Id.* Ex. 16 (emphasis added).

The Agreement Regarding Collateral similarly provided that:

> [Amerant] and Luna have agreed that [Amerant] *will* satisfy the Mortgage *if, but only if,* prior to July 15, 2015 Luna repays the Luna Debt in full, funds Luna's deposit account no. [xxxxxx]5506 with [Amerant] (the "[Pledged] Account") with a minimum balance of $5 million, grants to [Amerant] a continuing, first-priority security interest in the [Pledged] Account to secure the BHQ Debt and otherwise complies with this Agreement.[52]

The Agreement Regarding Collateral also required Luna to contemporaneously execute and deliver to Amerant the Deposit Assignment Agreement to establish the new Pledged Account, "which grants to [Amerant] a continuing, first-priority security interest in the [Pledged] Account to secure the BHQ Debt."[53] The Agreement Regarding Collateral further required Luna to "instruct the Buyer and the closing agent" to remit all of the net sale closing proceeds to Amerant[54] and stated that:

> Luna hereby irrevocably authorizes [Amerant] to use the Net Closing Proceeds received by it to repay in full the Luna Debt (together with whatever reasonable attorneys' fees [Amerant] incurs in connection with the transactions contemplated by this Agreement), *to fund* the [Pledged] Account with $5 million and to deposit any remainder in Luna's operating account with [Amerant]. Upon [Amerant]'s demand, Luna shall execute and deliver to [Amerant] whatever account opening documentation [Amerant] requires in connection with establishing the [Pledged] Account.[55]

Consistent with the Agreement Regarding Collateral, the Deposit Assignment Agreement provided that Luna "will establish with [Amerant] a time deposit or money market account into which *will be* directly deposited $5 million of the proceeds

---

[52] *Id.* Ex. 14 (emphasis added).

[53] *Id.*

[54] *Id.*

[55] *Id.* (emphasis added).

of the sale of certain real estate owned by [Luna] and mortgaged to [Amerant] to secure both debt of [Luna] to [Amerant] and debt of [BHQ] to [Amerant]."[56] The Deposit Assignment Agreement also included the following provisions:

> 1. <u>Assignment of Collateral</u>. As security for any and all Indebtedness (as defined below),[57] [Luna] hereby pledges and assigns to [Amerant] and grants to [Amerant] a security interest in the following (the "Collateral"): (i) the [Pledged] Account; (ii) all certificates and instruments, if any, from time to time constituting, representing or evidencing the [Pledged] Account; (iii) all interest dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Collateral; and (iv) to the extent not covered by clauses (i) through (iii), all proceeds of any or all of the foregoing Collateral. . . .

> * * *

> 5. <u>Representations and Warranties</u>. [Luna] represents, warrants and agrees that . . . this Agreement creates a valid and perfected, first priority security interest in all of the Collateral securing all of the Indebtedness . . . and the transaction of which this Agreement is a part is of direct business benefit to [Luna] and [Luna] has received adequate consideration and equivalent value for executing, delivering and performing this Agreement; and [Luna] is not insolvent and will not become so as a result of the assignment and security interest contemplated by this Agreement; and [Luna] is not entering into this Agreement with any intent to hinder, delay or defraud any past or future creditor.[58]

---

[56] *Id.* Ex. 15 (emphasis added).

[57] "Indebtedness" is defined as "all obligations and liabilities of [BHQ] to [Amerant] now or hereafter evidenced by or existing under the Notes, whether for interest, principal, fees, expenses or otherwise, and all obligations and liabilities of [Luna] to [Amerant] arising hereunder." Compl. Ex. 15, § 1. "Notes" is defined as an Amended and Restated Promissory Note, dated March 5, 2013, in the original principal amount of $15,141,293.25, made by [BHQ] to [Amerant]'s order and a Promissory Note, dated March 5, 2013, made by [BHQ] to [Amerant]'s order in the original principal amount of $5,500,000.00 (together with any and all renewals or modifications thereof and substitutions therefor . . .)" *Id.* Ex. 15, § A.

[58] Compl. Ex. 15, at 1-3.

On July 9, 2015 – ten days after execution of the Agreement Regarding Collateral, the Deposit Assignment Agreement, and the June 29 Letter – Luna's sale of the Luna Property to Eagle closed,[59] with Eagle wiring $12,305,562.64 to Amerant.[60] Pursuant to the wiring instructions and receipt, the funds were applied first to pay off the Luna Loan; then $5 million was credited to the Pledged Account; $2750.00 went to pay attorneys' fees; and the remaining balance of $144,712.60[61] was deposited into Luna's operating account #8406.[62]

Referencing a copy of the publicly recorded "Satisfaction of Mortgage" attached to its Complaint as Exhibit 18, Luna alleges that "[u]pon [Amerant]'s receipt of the sale proceeds from the Luna Property, [Amerant] released and terminated the Final Cross Collateral Agreement and the liens allegedly granted thereby."[63] The Satisfaction of Mortgage attached as Exhibit 18, however, is dated August 12, 2015 (over a month after the closing) and was recorded on September 17, 2005 (more than two months after the closing).[64]

---

[59] *Id.* ¶ 43 & Ex. 17.

[60] *Id.* Ex. 17.

[61] *Id.* ¶ 56 & Ex. 28.

[62] *Id.* Ex. 28.

[63] *Id.* ¶ 44.

[64] *Id.* Ex. 28.

E.    Mr. Arcila is Concerned about Creditors Garnishing the Pledged
Account.

Before the closing, Mr. Fernandez conveyed to Amerant Mr. Arcila's concerns about whether the sale proceeds could be garnished by Luna's other creditors.[65] Mr. Arcila himself also emailed concerns about where and how the $5 million in pledged funds would be held, and whether an entity named Hemphill Financial might "have the power to block any Luna account" and delay BHQ's construction project.[66] The day before the closing, Mr. Fernandez asked Amerant if the closing proceeds could be transferred "immediately to a Synergy account to avoid any potential garnishment."[67] Amerant replied that after payment in full of the Luna Loan and depositing $5 million into the Pledged Account, any remaining funds could be deposited into a Synergy account.[68] Later that evening, Mr. Fernandez sent another email to Amerant, asking specifically if the $5 million in pledged funds could be moved to a Synergy account, rather than an account in Luna's name.[69] Amerant replied, however, that "based on the Agreement Regarding Collateral and Deposit Assignment Agreement signed by Juan [Arcila], the monies will need to be deposited into Luna's account."[70]

---

[65] *Id.* ¶¶ 46-47 & Ex. 20.

[66] *Id.* ¶ 48.

[67] *Id.* ¶ 49 & Ex. 22.

[68] *Id.* ¶ 50 & Ex. 22.

[69] *Id.* ¶ 51 & Ex. 23.

[70] *Id.* Ex. 23.

As late as the morning of the closing, Mr. Arcila continued to express concern about Luna's other creditors potentially being able to access the $5 million Pledged Account, and again asked if the agreements with Amerant could "be signed including Synergy as well."[71] Notwithstanding these requests, the closing proceeded later that day in accordance with the Agreement Regarding Collateral and Deposit Assignment Agreement, as detailed above.[72] After payoff of the Luna Loan and funding of the $5 million Pledged Account, the remaining $144,712.60 in sale proceeds were credited to Luna's operating account #0806, which, when added to the existing balance in that account, resulted in a total balance of $232,935.33.[73] The day after the closing, Luna transferred $232,935.32 from its operating account #0806 to a Synergy account (#6006) at Amerant (the "Synergy Transfer"). After the Synergy Transfer, the remaining balance in Luna's operating account #0806 was $0.01.

Even after the closing Mr. Arcila remained concerned about the $5 million in the Pledged Account being in Luna's name.[74] On July 22, 2015 – about two weeks after the closing – Mr. Arcila emailed attorneys Juan Martinez, Esq. (counsel for both Luna and BHQ) and William Smith, Esq. (counsel for Amerant), stating: "I spoke with Christina at the Bank and she suggested to have a call among all of us, to find

---

[71] *Id.* ¶¶ 52-54 & Exs. 24-26.

[72] *Id.* ¶ 56.

[73] *Id.* Ex. 28.

[74] *Id.* ¶¶ 57-58 & Ex. 29.

the best way to allocate and secure the $5MM."[75] Mr. Martinez responded by proposing a call for the next day.[76]

F.   Luna Transfers the $5 Million in Pledged Funds to Amerant.

Meanwhile, BHQ's construction loan from Amerant was due to mature on September 5, 2015.[77] With Luna continuing to hold $5 million in the Pledged Account as collateral for BHQ's obligations to Amerant, Luna, BHQ, and Amerant began discussing how to apply Amerant's collateral being held in the Pledged Account to reduce BHQ's debt to Amerant.[78] Ultimately, the parties decided to prepare a "Tri-Party Agreement," to give "some context to the whole matter."[79]

The Tri-Party Agreement acknowledged the sale of the Luna Property and that Luna was holding $5 million in proceeds as collateral for BHQ's obligations.[80] The Tri-Party Agreement further acknowledged that BHQ owed Amerant more than $17 million in respect of both a term loan and a construction loan, and that the construction loan was due to mature on September 5, 2015.[81] Luna, BHQ, and Amerant also acknowledged a $10.1 million intercompany debt from Luna to BHQ (the "Intercompany Debt"), and contemplated that in partial repayment of the

---

[75] *Id.* ¶ 60 & Ex. 30.

[76] *Id.* Ex. 30.

[77] *Id.* ¶ 79 & Ex. 34.

[78] *Id.* Exs. 29, 30.

[79] *Id.* ¶ 67 & Ex. 32.

[80] *Id.* Ex. 34.

[81] *Id.* The Tri-Party Agreement also recited that BHQ's construction loan and term loan were cross-defaulted.

17

Intercompany Debt, Luna would transfer the $5 million in the Pledged Account to Amerant, to reduce BHQ's obligations to Amerant.[82]

At the time of these discussions, however, the Intercompany Debt had not been evidenced by a promissory note or any other writing.[83] So Mr. Martinez, as counsel to Luna and BHQ, prepared a draft undated $10,096,789.94 promissory note, with Luna as the "Borrower" and BHQ as the "Lender" (the "Promissory Note").[84] The draft Promissory Note would obligate Luna to pay BHQ $5 million on or before August 31, 2015, with the remaining balance due January 1, 2020.[85]

Luna, BHQ, and Amerant executed the Tri-Party Agreement on August 10, 2015,[86] which served to irrevocably authorize and direct Amerant to apply the $5 million in the Pledged Account "to make a principal prepayment of the BHQ Term Loan in the amount of $5 million."[87] The day after Luna, BHQ, and Amerant executed the Tri-Party Agreement, Mr. Smith requested a copy of the Promissory Note,[88] which apparently had not yet been signed.[89] At Mr. Martinez's request, Mr. Arcila then executed the note[90] signing as "Managing Partner" of "Luna Developments, LLC" as

---

[82] *Id.* ¶ 70 & Ex. 34.

[83] *Id.* ¶ 63.

[84] *Id.* ¶ 65 & Ex. 31.

[85] Compl. ¶ 66 & Ex. 31.

[86] *Id.* ¶ 69.

[87] *Id.* ¶ 72 & Ex. 34.

[88] *Id.* ¶ 73 & Ex. 35.

[89] *Id.* ¶ 74 & Ex. 36.

[90] *Id.* ¶¶ 74, 75 & Exs. 36, 37.

"Borrower."[91] The following day – August 12, 2015 – in accordance with the authority and direction provided to it under the Tri-Party Agreement, Amerant debited Luna's Pledged Account in the amount of $5 million, and credited BHQ's Loan no. xxxxx6263 in the amount of $5 million (the "Pledged Funds Transfer").[92]

>    G.    Luna Ends Up in Receivership and then Bankruptcy.

On October 24, 2017, the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida appointed Mr. Barbee as receiver for Luna,[93] and on January 28, 2019, Mr. Barbee, as receiver, filed a chapter 11 bankruptcy petition for Luna.[94]

## IV.    Analysis.

The Complaint contains five counts. Count I alleges that Luna's grant of a security interest in the Pledged Account was an actual fraudulent transfer avoidable under 11 U.S.C. § 544 and Florida Statute § 726.105(1)(a). Count II alleges that the grant of a security interest in the Pledged Account was a constructive fraudulent transfer avoidable under 11 U.S.C. § 544 and Florida Statute § 726.106(1). Count III alleges that the Pledged Funds Transfer was an actual fraudulent transfer avoidable under 11 U.S.C. § 544 and Florida Statute § 726.105(1)(a). Count IV seeks recovery of the Pledged Funds Transfer pursuant to 11 U.S.C. § 550. And Count V alleges that Amerant aided and abetted Mr. Arcila's alleged breach of fiduciary duty to Luna.

---

[91] *Id.* ¶ 75 & Ex. 37. Luna's name, however, is "Luna Developments Group, LLC," not "Luna Developments, LLC."

[92] Compl. ¶ 77 & Exs. 39, 40.

[93] *Id.* ¶ 2.

[94] *Id.* ¶ 4.

A.    <u>The Plaintiff's Standing</u>.

Under the Bankruptcy Code, Congress vested bankruptcy trustees with authority to bring fraudulent transfer claims both under substantive provisions of the Bankruptcy Code (§ 548) as well as applicable state law (like FUFTA). In a chapter 11 case, a debtor-in-possession exercises the powers of a trustee and therefore can bring such claims in its own name.[95] In this case, no trustee was appointed under 11 U.S.C. § 1104. In the absence of a trustee, Luna was technically a debtor-in-possession when the Complaint was filed, although rather than being managed by its managers or members, it was being administered by a previously-appointed state court receiver who had been excused from turning over the debtor's property to a trustee.[96] Thus, while the Complaint was nominally filed by Mr. Barbee in his capacity as receiver excused from turnover, it appears to be the debtor-in-possession (as administered by Mr. Barbee) that was really asserting these claims. But, because the Court will be dismissing the Complaint on the merits of the substantive legal issues, the Court need not adjudicate the plaintiff's standing. Rather, for purposes of the Motion to Dismiss, the Court will assume without deciding that the claims were asserted by Luna, as chapter 11 debtor-in-possession being operated by Mr. Barbee,

---

[95] 11 U.S.C. § 1107.

[96] *See* 11 U.S.C. § 543.

a receiver excused from turnover pursuant to Bankruptcy Code § 543 with authority to operate and direct the debtor-in-possession.

      B.    <u>Avoidance and Recovery of Fraudulent Transfers</u>.

Bankruptcy Code § 544(b) allows a trustee (or a debtor-in-possession exercising the rights, powers and duties of a trustee)[97] to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable [state] law by a creditor holding an [allowable] unsecured claim."[98] Luna seeks to avoid the grant of a first-priority security interest in the Pledged Account as an actual fraudulent transfer under Florida Statute § 726.105(1)(a) and as a constructive fraudulent transfer under Florida Statute § 726.106(1), and to avoid the Pledged Funds Transfer as an actual fraudulent transfer under Florida Statute § 726.105(1)(a). If successful in avoiding the Pledged Funds Transfer, then Luna also seeks to recover the Pledged Funds Transfer from Amerant, as an initial or subsequent transferee or the entity for whose benefit the transfer was made, under 11 U.S.C. § 550.

Florida Statute § 726.105(1)(a) provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."[99] Florida Statute § 726.106(1) provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose

---

[97] 11 U.S.C. § 1107(a).

[98] 11 U.S.C. § 544(b).

[99] Fla. Stat. § 726.105(1)(a).

claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."[100] Bankruptcy Code § 550 allows a trustee to recover any transfers avoided under § 544 from "the initial transferee, the entity for whose benefit the transfer was made, or a subsequent transferee of the initial transferee."[101]

1. *The Grant of a Security Interest in the Pledged Account Was Not an Avoidable Transfer.*

To avoid and recover alleged fraudulent transfers, Luna must first allege that the grant of a first-priority security interest in the Pledged Account was a "transfer." The Bankruptcy Code defines "transfer," in relevant part, as "(A) the creation of a lien; (B) the retention of title as a security interest; . . . or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property."[102] FUFTA similarly defines "transfer" as meaning "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other

---

[100] Fla. Stat. § 726.106(1).

[101] 11 U.S.C. § 550; *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1198 (11th Cir. 1988) (citing 11 U.S.C. § 544(a)).

[102] 11 U.S.C. § 101(54).

encumbrance."[103] FUFTA then defines "asset" to mean "property of a debtor" but specifically excludes "[p]roperty to the extent it is encumbered by a valid lien."[104]

Amerant argues the granting of a security interest in the Pledged Account is not a transfer that can be avoided because Amerant already had a lien on the $5 million in Luna sale proceeds that were deposited into that account. Thus, the transfer of those proceeds into the Pledged Account and the use – several weeks later – of those proceeds to pay down the BHQ Loan, were not transfers subject to avoidance under FUFTA.[105] The Court agrees.

a.    Amerant Did Not Release Its Liens Before Creation and Funding of the Pledged Account.

Luna's November 29, 2006 Mortgage Deed and Security Agreement[106] gave Amerant a security interest in Luna's land and buildings and property located thereon,[107] as well as, without limitation, "all present and future contracts"[108] and all "proceeds of the conversion, voluntary or involuntary, of the Mortgaged Property, or any part thereof, into cash or liquidated claims."[109] Likewise, the Sales Proceeds Assignment[110] given to Amerant in connection with the 2007 Cross Collateral

---

[103] Fla. Stat. § 726.102(14).

[104] Fla. Stat. § 726.102(2). FUFTA also provides that a transfer is not voidable under § 726.105(1)(b) or § 726.106 if the transfer results from "[e]nforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code." Fla. Stat. § 726.109(5)(b).

[105] Mot. to Dismiss 14.

[106] Compl. Ex. 1.

[107] *Id.* ¶ (a).

[108] *Id.* ¶ (g).

[109] *Id.* ¶ (d).

[110] Compl. Ex. 5.

Agreement encumbered all of Luna's "right, title and interest in, to and under the Contracts [defined to include any sale contracts], including without limitation (a) all rights of Assignor [Luna] to receive monies due or to become due under each and any of the Contracts . . . ."[111] Paragraph 2 of the 2007 Cross Collateral Agreement further provided that the "Luna Security Documents[112] and all collateral securing the Luna Loan shall serve as additional security for the [BHQ] Loan and the full and faithful performance by [BHQ] of its obligations under" its loan documents with Amerant.[113]

The entire theory of Luna's case is really premised on the allegation that Amerant released and terminated its Final Cross Collateral Agreement and liens granted thereby *before* Luna granted Amerant a security interest in the Pledged Account.[114] If that was true, then Luna might be correct that "[t]he grant of a first-priority security interest in the Pledged Account . . . following the Defendant's receipt of not less than $12,300,000 pursuant to the Deposit Agreements and Release Letter was a transfer of an interest of the Debtor in property."[115] But, the Court need not accept as true "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts"[116] when considering a motion to dismiss. Here,

---

[111] *Id.* ¶¶ 1, 2.

[112] The 2007 Cross Collateral Agreement defined "Luna Security Documents" to include the mortgage, assignment of leases and rents, UCC-1 financing statements, and "all other documents now or hereafter securing the Luna Loan." Compl. Ex. 4, ¶ A.

[113] Compl. Ex. 4, ¶ 2.

[114] Compl. ¶¶ 44, 45.

[115] *Id.* ¶¶ 84, 89.

[116] *Oxford Asset Mgmt.*, 297 F.3d at 1188.

these conclusory allegations are contradicted by other allegations and exhibits to the Complaint, which plainly show that Amerant's liens had not yet been released at the time the Pledged Account was established and Luna granted Amerant a lien thereon. Indeed, the publicly recorded "Satisfaction of Mortgage" referenced by Luna in support of its allegations was signed on August 12, 2015 and recorded on September 17, 2015[117] – well after both the creation and the funding of Pledged Account. Likewise, Luna fails to include any allegations that any satisfaction of mortgage or release of liens was ever given or recorded *before* the creation of the Pledged Account.

The best Luna can do is to point to the June 29 Letter and label it a "Release Letter."[118] But a careful reading of the June 29 Letter shows it does nothing more than confirm what Amerant intends or promises to do in the future:

> the Bank *will* satisfy or terminate (as appropriate) its mortgage, assignment of rents, and financing statement(s) securing the aforementioned loan *if and after* it receives, in immediately available funds, no later than July 15, 2015, all of the net closing proceeds in an amount not less than $12.3 million from the sale to [Eagle].[119]

Indeed, the sequence of events is telling:

**June 29, 2015:**

- Luna and Amerant execute the Agreement Regarding Collateral and the Deposit Assignment Agreement;[120]

---

[117] Compl. Ex. 18. *Compare with* Compl. Ex. 2 (the partial releases of the Luna Mortgage publicly recorded after Luna had converted certain rental apartment units to condominiums). Luna has not alleged any such release or partial release of Amerant's cross-collateral security interests at or before the creation or funding of the Pledged Account.

[118] Compl. ¶ 38.

[119] *Id.* (emphasis added) & Ex. 16.

[120] *Id.* ¶ 37 & Exs. 14, 15.

- Amerant gives Luna the June 29 Letter;[121]

**July 9, 2015:**

- Luna closes on the Eagle sale;[122]
- $12,305,562.64 is wired to Amerant and used to satisfy the Luna Loan,[123] fund $5 million into the Pledged Account,[124] and pay $2750.00 in attorneys' fees,[125] with the balance of $144,712.60 being deposited into Luna's operating account at Amerant;[126]

**August 12, 2015:**

- Amerant executes a Satisfaction of Mortgage;[127] and

**September 27, 2015:**

- The Satisfaction of Mortgage is recorded.[128]

Before Luna sold the Luna Property to Eagle, the equity in the Luna Property above the mortgage balance on the Luna Loan – along with the contracts and other collateral – clearly secured the cross-collateralized BHQ Loan.[129] The Deposit Assignment Agreement simply created a new account established specifically to receive and hold the already-encumbered proceeds of the sale. While the Deposit Assignment Agreement did state that it creates a valid and perfected first priority security interest in the account, the account was not funded at the time it was created.

---

[121] *Id.* Ex. 16.

[122] *Id.* ¶ 43 & Ex. 17.

[123] *Id.*

[124] *Id.* Ex. 19.

[125] *Id.* Ex. 17.

[126] *Id.* Ex. 28.

[127] *Id.* Ex. 18.

[128] *Id.*

[129] *See* footnotes 106-113, *supra.*

Thus, any lien granted on the Pledged Account as of June 29, 2015 necessarily had no value as of that date.

In establishing the Pledged Account, Amerant took lawful, reasonable, and appropriate actions to protect its collateral and maintain its lien. Amerant had a lien on the sale contract and its proceeds. Amerant and Luna then established the Pledged Account – at the time unfunded – and granted a lien in favor of Amerant in the account, so that when the sale closed and the collateral (real estate and contractual rights) was converted into cash (to which that lien attached), Amerant had an appropriate repository for the funds that would enable them to retain their perfected secured status.

### b. The Transactions Were Properly Contemplated, Structured, and Executed under Article 9 of the UCC.

Indeed, the transactions at issue were properly contemplated, structured, and executed in accordance with Article 9 of the Uniform Commercial Code. Under UCC § 9-315(a)(2), a security interest attaches to any identifiable proceeds of collateral following disposition of the original collateral.[130] If the original security interest was perfected (there has been no allegation that it was not),[131] then under UCC § 9-315(c),

---

[130] Fla. Stat. § 679.3151(1)(b).

[131] *See* Compl. Ex. 1 (Mortgage Deed and Security Agreement), Ex. 4 (Cross-Collateral and Cross-Default Agreement), Ex. 5 (Collateral Assignment of Sales Contracts and Sales Proceeds); *see also* Mot. to Dismiss Ex. B (Assignment of Leases and Rents) & Exhibit C (UCC-1 Financing Statement). In deciding Rule 12(b)(6) motions, courts may consider exhibits attached to the complaint that are central to the claim and the authenticity of which is not disputed. *See Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). Courts may also consider other documents central to a claim if the authenticity and contents of the documents are not in dispute. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)). The Assignment of Leases and Rents and the UCC-1 Financing

the security interest in the proceeds is automatically perfected as well.[132] Under UCC § 9-315(d), however, a perfected security interest in proceeds may then become unperfected on the twenty-first day after the security interest attaches to the proceeds, if certain conditions are not met.[133]

But here, Amerant's collateral was converted to "identifiable cash proceeds"[134] on August 9, 2015 (the date of the closing),[135] which resulted in the continuation of perfection of Amerant's security interest in the cash proceeds under UCC § 9-315(d)(2).[136] The identifiable cash proceeds of $5 million in which Amerant unquestionably had a perfected security interest were then deposited into the Pledged Account that same day.[137] Amerant was also perfected by control[138] of the collateral at that point.[139] Thus, based on the well-pleaded allegations in the Complaint, there was no point in time before the funding of the Pledged Account when Amerant's security interest had been released, lapsed or was unperfected.

At bottom, Amerant took entirely appropriate action to preserve and protect its existing liens, and to ensure that it retained those liens when its collateral was

---

Statement were not attached to the Complaint, but were attached by Amerant to its Motion to Dismiss. These documents are central to Luna's claims, and Luna has not challenged their authenticity or contents.

[132] Fla Stat. § 679.3151(3).

[133] Fla Stat. § 679.3151(4).

[134] Fla. Stat. § 679.3151(4)(b).

[135] Compl. ¶ 43 & Ex. 17.

[136] Fla. Stat. § 679.3151(4)(b).

[137] Compl. Ex. 19.

[138] *See* UCC §§ 9-314(a) (perfection by control) and 9-104(a)(1) (control of deposit account); Fla. Stat. §§ 679.3141(a) and 679.1041(1)(a).

[139] *Id.* Ex. 15, ¶ 2 ("Bank shall have complete control over the Collateral.").

converted to cash. Accordingly, because the $5 million in sale proceeds that was deposited into the Pledged Account was already encumbered by a valid lien, under Florida Statute § 726.102(2), this $5 million was not an "asset" and therefore the transfer of the $5 million into the Pledged Account was not a transfer that can be avoided under FUFTA. Likewise, because the Pledged Account was unfunded and had no value when it was created – and when it was funded it was funded with already encumbered funds – creation of the Pledged Account and the granting of a lien therein is not a transfer subject to avoidance under FUFTA, either. Accordingly, Counts I and II – both of which challenge the creation of the Pledged Account – must be dismissed.[140]

### 2. *The Pledged Funds Transfer Was Not an Avoidable Transfer.*

Because the Pledged Account was already encumbered by a valid, perfected lien in favor of Amerant, the application of the $5 million in that account to reduce BHQ's debt to Amerant was also not an avoidable transfer.[141] It is not fraudulent to pay some but not all creditors, "even though the effect might be to injure or prejudice an existing creditor who was not chosen to receive the debtor's largesse."[142] Moreover, to recover a payment made on a pre-existing mortgage as a fraudulent transfer, the plaintiff must establish that the pre-existing mortgage or other lien was not effective

---

[140] Because the Court finds there was no transfer subject to avoidance, the Court need not address Amerant's reasonably equivalent value argument with respect to Count II.

[141] *See Sunshine Res., Inc. v. Simpson*, 763 So. 2d 1078, 1081 (Fla. 4th DCA 1999) (a payment made on a pre-existing mortgage is not a fraudulent transfer, even if the effect of the payment is to prefer one creditor over another).

[142] *Id.* (quoting *Jacksonville Bulls Football Ltd. v. Blatt*, 535 So.2d 626, 629 (Fla. 3d DCA 1988)).

to secure the debt.[143] For the reasons discussed above, Amerant's perfected lien on the Pledged Account was effective to secure BHQ's debt to it. Therefore, Luna's transfer of $5 million from the Pledged Account to Amerant was not an avoidable transfer, and Count III fails as a matter of law as well.[144] And because Count III fails, Count IV – which seeks to recover the Pledged Funds Transfer – also fails to state a claim because there is no avoidable transfer to recover.

C.    Aiding and Abetting Breach of Fiduciary Duty.

Finally, Luna alleges that Mr. Arcila breached his fiduciary duties to Luna by "shielding the net proceeds of the sale of the Luna Property from the Debtor's legitimate creditors,"[145] and that Amerant aided and abetted this alleged breach.[146] In support of its generalized allegations, Luna alleges the following specific actions by Mr. Arcila constituted breaches of his fiduciary duties to Luna:

- executing the Deposit Assignment Agreement resulting in net proceeds in excess of the amount of the Luna debt being delivered to Amerant;
- granting to Amerant a lien on the Pledged Account;
- directing, or attempting to direct, the transfer of the net proceeds to avoid garnishment and other collection efforts; and
- permitting Amerant to apply the amounts on deposit in the Pledged Account to reduce the amount outstanding under the BHQ Loan.[147]

---

[143] *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1326-27 (M.D. Fla. 2015).

[144] Because the Court has determined that the transactions at issue were not transfers under FUFTA, the Court need not address or resolve Amerant's argument that Luna really seeks to avoid the 2007 cross-collateral lien, which claim is time-barred. In any event, Luna admits in its Response that it does not seek to avoid the 2007 Cross Collateral Agreement. Resp. 3 n.2.

[145] Compl. ¶ 106.

[146] *Id.* ¶¶ 107-18.

[147] *Id.*

      1.    *Luna Has Failed to Plausibly Allege any Breach of Fiduciary Duty.*

To state a claim for breach of fiduciary duty under Florida law, a plaintiff must plausibly allege: (1) the existence of a fiduciary duty, (2) breach of a fiduciary duty, and (3) that the breach proximately caused the plaintiff's damages.[148] While the Complaint's specific allegations as to the existence of a fiduciary duty are sparse, the Court will assume for purposes of ruling on the Motion to Dismiss that as a manager,[149] "de facto manager,"[150] or one who "exercised managerial control of" Luna,[151] Mr. Arcila owed fiduciary duties to Luna.[152] But – as discussed above – executing the Deposit Assignment Agreement, granting a lien on the Pledged Account, and permitting Amerant to apply the funds in the Pledged Account to reduce BHQ's loan obligations were not avoidable transfers and were not otherwise improper. Indeed, the transactions were contemplated, documented, and executed in a manner consistent with Article 9 of the Uniform Commercial Code.[153] By causing Luna to execute the Deposit Assignment Agreement, grant a lien on the Pledged Account, and permit Amerant to apply the Pledged Funds to reduce BHQ's liability,

---

[148] *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1331 (S.D. Fla. 2018) (citing *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002); *Doshi v. Cagle Road Land, LLC*, Case No. 3:17–cv–308–J–34JRK, 2018 WL 1796224, at *8 (M.D. Fla. Jan. 23, 2018)).

[149] Compl. ¶ 103.

[150] *Id.* ¶ 104.

[151] *Id.*

[152] *See generally McCoy v. Durden*, 155 So. 3d 399, 402-05 (Fla. 1st DCA 2014) (discussing fiduciary duties of LLC managers under the Florida Limited Liability Company Act (Fla. Stat. § 608.4225 (2011)), which has since been repealed and replaced by the Florida Revised Limited Liability Company Act, effective as of January 1, 2015).

[153] *Infra*, Part IV.B.1.b.

Mr. Arcila did nothing more than cause Luna to properly honor its obligations to Amerant under the Final Cross Collateral Agreement and related security documents. Nothing about those actions plausibly suggest any breach of a fiduciary duty by Mr. Arcila to Luna.

The only allegation that even suggests a breach of fiduciary duty by Mr. Arcila is that he directed or – more accurately – "*attempt*[*ed*] to direct the transfer of the net proceeds to avoid garnishment and other collection efforts."[154] But even as to this allegation, any attempt by Mr. Arcila to move the Pledged Account from Luna to another entity cannot be a breach of fiduciary duty because, as discussed above, this account and its contents were Amerant's collateral.

> ### 2.    *Luna Has Failed to Plausibly Allege Knowledge or Substantial Assistance.*

Even if Luna had adequately alleged a breach of fiduciary duty, however, it still has failed to state a claim against Amerant for aiding and abetting breach of fiduciary duty. An aiding and abetting claim under Florida law requires a plaintiff to allege: (1) an underlying violation by a primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor.[155] When an aiding and abetting breach of fiduciary duty claim is asserted against a lender, however, the plaintiff must allege specific facts showing that the lender knew that its

---

[154] Compl. ¶ 106.

[155] *In re Rollaguard Sec., LLC*, 591 B.R. 895, 922 (Bankr. S.D. Fla. 2018) (quoting *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012)).

customer was engaging in wrongful or illegal activity.[156] This "knowledge" element "will only be satisfied if the plaintiff pleads facts demonstrating that the bank had 'actual knowledge' of the wrongdoings."[157] "Importantly, in the context of aiding and abetting claims against banks, Florida law does not require banks to investigate their customers' transactions."[158] "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."[159] But "mere inaction" will constitute substantial assistance "only if the defendant owes a fiduciary duty directly to the plaintiff."[160]

Here, the allegations in the Complaint, if proven, would not raise a plausible inference that Amerant actually knew Mr. Arcila was engaged in a breach of his fiduciary duty to Luna. For example, Luna alleges that Mr. Arcila requested Amerant to produce a release letter without reference to the cross-collateral agreement,[161] and that in fact the June 29 Letter failed to disclose the existence of the cross-collateral agreement.[162] Both the 2007 Cross Collateral Agreement and the Final Cross

---

[156] *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11–60670–CIV, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012); *Groom v. Bank of Am.*, No. 8:08–cv–2567–JDW–EAJ, 2012 WL 50250, at *2-3 (M.D. Fla. Jan. 9, 2012); *Lawrence v. Bank of Am., N.A.*, No. 8:09–cv–2162–T–33TGW, 2010 WL 3467501, at *3 (M.D. Fla. Aug. 30, 2010); *Hines v. FiServe, Inc.*, No. 8:08–cv–2569–T–30AEP, 2010 WL 1249838, at *4 (M.D. Fla. Mar. 25, 2010).

[157] *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (citing *Lawrence*, 455 F. App'x at 907).

[158] *Rollaguard*, 591 B.R. at 922-23 ("'Red flags' and mere suspicions are insufficient to trigger any obligation by [a bank] to investigate.") (internal citation omitted).

[159] *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017).

[160] *Id.* (internal quotation marks and citation omitted).

[161] Compl. ¶ 34 & Ex. 12; *see* footnote 45, *supra*.

[162] *Id.* Ex. 16.

Collateral Agreement, however, were recorded in the public records.[163] Amerant's knowledge that Mr. Arcila requested Amerant not mention the Cross Collateral Agreement in the June 29 Letter is simply not probative of any plausible allegations that Mr. Arcila breached his fiduciary duty, or that Amerant had knowledge and substantially assisted such alleged breach of fiduciary duty.

Likewise, Amerant's knowledge that Mr. Arcila was concerned about creditors garnishing Luna's accounts – and even its knowledge that Mr. Arcila requested the Pledged Account be held in another entity's name (which request Amerant refused) – does not support actual knowledge that Mr. Arcila was breaching his fiduciary duty to Luna because, as discussed above, it has not been plausibly alleged that he *was* breaching his fiduciary duty. That Mr. Arcila wanted to move the $5 million in pledged funds to the name of another entity – purportedly over concerns about claims of other Luna creditors – does not show intent to breach fiduciary duty because those funds were not available to other creditors anyway; they were already encumbered and therefore not an "asset" subject to "transfer" under FUFTA.[164] As to the Synergy Transfer, while that transfer may have been a fraudulent transfer by Luna to Synergy, any fraudulent transfer claim Luna may have against Synergy is not a claim against Amerant, who simply honored its customer's lawful directions to transfer the money.[165]

---

[163] *Id.* Exs. 4, 8.

[164] Fla. Stat. § 726.102(2)(a).

[165] *O'Halloran v. First Union Nat. Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003) (a bank "has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds.")

Similarly, the Complaint does not contain sufficient allegations to plausibly support the inference that Amerant rendered substantial assistance to Mr. Arcila's alleged breach of fiduciary duties. Luna alleges only that Amerant provided substantial assistance to Mr. Arcila in breaching his fiduciary duty by "compelling the grant of the lien on the Debtor's funds from the sale of the Luna Property" and "the subsequent transfer of the Debtor's money to reduce BHQ's liability to [Amerant] thereby improving [Amerant's] position."[166] But again, as discussed above, these actions did not even result in avoidable transfers, and certainly did not breach any fiduciary duties. Thus, there are no plausible allegations of substantial assistance with respect to the establishment of the Pledged Account or the Pledged Funds Transfer. Even as to the Synergy Transfer, there are no plausible allegations that Amerant did anything other than act on lawful instructions of its banking customer.[167] In facilitating the creation of the Pledged Account and the later Pledged Funds Transfer, Amerant was doing nothing more than acting in its own financial interest and in accordance with its own legal and contractual rights.[168] Acts that are "consistent with normal, lawful [banking] business practices" will not support an aiding and abetting breach of fiduciary duty claim.[169]

---

[166] Compl. ¶ 108.

[167] *O'Halloran*, 350 F.3d at 1205.

[168] *See Sharp Intern. Corp. v. State Street Bank and Trust Co. (In re Sharp Intern. Corp.)*, 403 F.3d 43, 51 (2d Cir. 2005) (where lender requested repayment and encouraged borrower to obtain new financing, and lender had right to foreclose, lender did not aid or abet borrower in breaching fiduciary duty even though borrower was defrauding its own investors).

[169] *Krys v. Pigott*, 749 F.3d 117, 132 (2d Cir. 2014).

Luna's allegations pertaining to the Tri-Party Agreement and the Promissory Note lend no support to the aiding and abetting breach of fiduciary claim, either.[170] BHQ owed a valid debt to Amerant, which debt was properly secured by Luna's assets (first the Luna Property, contracts and proceeds, and other collateral, and later the $5 million in the Pledged Account). That Luna, BHQ, and Amerant prepared the Tri-Party Agreement to give "some context to the whole matter"[171] – even if done to allay Mr. Arcila's unfounded concerns about Luna creditors garnishing the Pledged Account – does not support a claim against Amerant for aiding and abetting breach of fiduciary duty.

Nor is preparation of the Promissory Note to document the Intercompany Debt probative of the aiding and abetting claim. A promissory note "evidence[s] a debt and specif[ies] terms under which one party will pay money to another."[172] But a promissory note is not required to create a debt, and a later-executed promissory note merely provides "documentary evidence of the amount of the antecedent debt" and "a timetable for the payment of that debt."[173] Luna attempts to cast doubt – without any plausible allegations – about its (own) $10.1 million debt to BHQ, relying principally on an inference that because the note was prepared shortly before the $5 million

---

[170] These allegations are also irrelevant to the fraudulent transfer claims because, as noted above, the transactions at issue were not transfers subject to avoidance.

[171] Compl. ¶ 67

[172] *Baggett v. Law Offices of Daniel C. Consuegra, P.L.*, No. 3:14-CV-1014-J-32PDB, 2015 WL 1707479, at *4 (M.D. Fla. Apr. 15, 2015) (quoting *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1217 (11th Cir. 2012)); *see also* Fla. Stat. § 679.1021(1)(mmm) (2011) ("'Promissory note' means an instrument that evidences a promise to pay a monetary obligation . . . .").

[173] *Matter of Red Way Cartage Co., Inc.*, 84 B.R. 459, 461 (Bankr. E.D. Mich. 1988).

paydown was made, somehow the underlying debt was invalid.[174] But "[h]ints and innuendo are not sufficient to support any necessary component of a claim."[175]

In sum, Luna has failed to plausibly allege that Amerant did anything other than protect its rights as a secured creditor and ensure that it received payments to which it was entitled.[176] That Amerant knew Mr. Arcila was concerned about the claims of other creditors and that Amerant collaborated with Luna and BHQ to document the transactions that resulted in Amerant realizing on its collateral and being repaid does not support allegations of aiding and abetting any alleged breach of fiduciary duty by Mr. Arcila. Accordingly, Luna's claim for aiding and abetting Mr. Arcila's breach of fiduciary duty fails to state a claim upon which relief may be granted, and will be dismissed along with the other four counts.

### D.    Motion for Leave to Amend

After Amerant filed its Motion to Dismiss, the Court entered a briefing order inviting a response by Luna and a reply by Amerant.[177] The Briefing Order further provided that:

> If Plaintiff wishes to request leave to amend the complaint, Plaintiff must accompany the response with a motion for leave to amend under

---

[174] While the incorrect name on the note – "Luna Developments, LLC" – might have some legal significance in other contexts, it is irrelevant to the allegations that Amerant aided and abetted a breach of Mr. Arcila's fiduciary duty to Luna.

[175] *In re D.I.T., Inc.*, 561 B.R. 793, 804 (Bankr. S.D. Fla. 2016) (citing *Sharp Intern. Corp.*, 403 F.3d at 56-57; *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005)).

[176] *See generally Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980) (so long as improper means are not employed, activities taken to safeguard or promote one's own financial and contractual interests are entirely non-actionable); *cf. Sharp Intern. Corp.*, 403 F.3d at 52 (bank's discovery of its borrower's fraud was an asset of the bank, which had a fiduciary duty *to its shareholders* to use that information – if it legally could – to maximize recovery on its loan).

[177] *Order Setting Briefing Schedule on Mot. to Dismiss* (ECF No. 10) (the "Briefing Order").

Fed. R. Civ. P. 15(a), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7015. Such motion for leave to amend must include a copy of the proposed amended complaint with redlined comparison to indicate changes. **The failure to file a motion for leave to amend along with any response to the Motion [to Dismiss] constitutes a waiver of the right to request leave to amend and, if the Motion [to Dismiss] is granted, may result in dismissal of the action with prejudice.**[178]

Luna timely filed its Response, along with a Motion to Amend.[179] But its Motion to Amend sought leave to amend the Complaint only "to add allegations regarding the standing of the Receiver to prosecute the claims asserted in the Complaint."[180] While not specifically mentioned in the Motion to Amend, the proposed Amended Complaint also proposed to add to each count a request for attorneys' fees and costs.[181] The Motion to Amend then stated that "to the extent the Court grants the Motion to Dismiss for other reasons, the Receiver seeks leave of Court to further amend the Complaint to respond to or address the Court's ruling."[182]

Under Federal Rule of Civil Procedure 15(a)(2),[183] "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."[184] Although the rule requires that leave to amend be freely given, a court may deny leave to amend on several grounds,

---

[178] *Id.* (emphasis in original).

[179] ECF No. 22.

[180] *Id.* ¶ 3.

[181] *Id.* at 24-27, 30.

[182] *Id.* ¶ 3.

[183] Made applicable here by Federal Rule of Bankruptcy Procedure 7015.

[184] Fed. R. Civ. P. 15(a)(2).

including the futility of the amendment.[185] Futility justifies denial of leave to amend where the complaint, as amended, would still be subject to dismissal.[186] Luna's proposed Amended Complaint here is futile, and therefore its Motion to Amend will be denied.

The proposed Amended Complaint is futile because, as noted above, the Court determined that it did not need to adjudicate the standing issue that Luna seeks to address therein. Rather, the Court assumed without deciding that Luna, as debtor-in-possession directed and operated by Mr. Barbee as receiver excused from turnover, had standing. With standing assumed, the Court nevertheless determined that each count of the Complaint failed to state a claim upon which relief may be granted, and that the entire Complaint should therefore be dismissed on the legal merits. And because Luna's claims fail on the merits, the Court of course need not address its requests for attorneys' fees. As such, the Motion to Amend will be denied as futile.

## V.     Dismissal with Prejudice.

Finally – notwithstanding the purported reservation of rights by Luna to seek leave to further amend to respond to or address the Court's ruling – dismissal will be with prejudice and Luna will not be given the opportunity to "further amend" its complaint. The Eleventh Circuit has held that a court "is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is

---

[185] *Patel v. Ga. Dep't BHDD*, 485 F. App'x 982, 982 (11th Cir. 2012) (citing *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1287 (11th Cir. 2003)).

[186] *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999).

represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."[187] Here, the Court specifically advised Luna in the Briefing Order that if it wished to request leave to amend, Luna must file a motion for leave to amend with its Response. That it did. But rather than propose an amended complaint directed to all of Amerant's arguments in its Motion to Dismiss, Luna cherry-picked issues and only proposed an amended complaint to bolster allegations of standing and to add a new request for attorneys' fees and costs. The proposed Amended Complaint did not in any way address or seek to remedy any of the other deficiencies raised by Amerant in its Motion to Dismiss.

Neither the Briefing Order nor Eleventh Circuit case law suggest that a plaintiff can keep coming back to the well with serial amendments. In fact, very recently the Eleventh Circuit affirmed the dismissal of a complaint with prejudice under circumstances similar to those presented here. In *Isaiah v. JPMorgan Chase Bank*,[188] the Eleventh Circuit affirmed the dismissal with prejudice of a complaint where the plaintiff "maintained throughout that his complaint is sufficient as it presently stands."[189] Only after the Eleventh Circuit ordered supplemental briefing – coincidentally, on the issue of a receiver's standing – did the plaintiff suggest that he should be permitted to amend his complaint to assert additional facts to avoid

---

[187] *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) (overruling precedent requiring that a plaintiff be given at least one chance to amend his complaint before the court dismisses the action with prejudice).

[188] 960 F.3d 1296, 1308 n.9 (11th Cir. June 1, 2020).

[189] *Id.*

dismissal.[190] The Eleventh Circuit rejected this argument, and affirmed the District Court's dismissal with prejudice of the plaintiff's complaint.[191] Similarly, in *Perlman v. Bank of America, N.A.*,[192] the Eleventh Circuit affirmed a district court's denial of leave to amend where the plaintiff sought leave to amend in a footnote contained in his response to a motion to dismiss, which did not indicate what additional facts the plaintiff intended to allege in a proposed amended complaint.

Here, Luna's "reservation of rights" in its Motion to Amend is the functional equivalent of the footnote in *Perlman*. Luna was given notice of Amerant's grounds for dismissal and provided with an opportunity to seek leave to amend to cure any deficiencies. By initially seeking leave to amend to only address standing (and to seek attorneys' fees and costs), Luna was implicitly maintaining that the rest of its Complaint was sufficient as pleaded. Now that the Court has determined the Complaint failed to state claims upon which relief may be granted as a matter of law – and Luna having failed to propose an amended complaint that supplements any allegations other than as to standing – Luna should not be given a further opportunity to amend its Complaint. The Complaint will therefore be dismissed with prejudice.

## VI.   Conclusion.

The creation and funding of the Pledged Account and the subsequent Pledged Funds Transfer were not transfers subject to avoidance under FUFTA. In

---

[190] *Id.*

[191] *Id.*

[192] 561 F. App'x 810, 814 (11th Cir. 2014).

contemplating, documenting, and executing these transactions, Mr. Arcila did not breach any fiduciary duty to Luna, and Luna has failed to plausibly allege that Amerant had knowledge of any breach of fiduciary duty or that it substantially assisted Mr. Arcila in breaching his fiduciary duty. These conclusions are evident from the facts alleged and accepted by the Court as true. And although given an opportunity to amend its Complaint, the proposed Amended Complaint failed to address these fatal deficiencies. As such, the Complaint fails to state a claim upon which relief may be granted and will be dismissed with prejudice, and the Motion to Amend will likewise be denied.

### ORDER

For the foregoing reasons, it is therefore **ORDERED** that:

1.      The Motion to Dismiss is **GRANTED.**

2.      The Motion to Amend is **DENIED.**

3.      The Complaint is **DISMISSED WITH PREJUDICE.**

# # #

Copies to all parties of record by the Clerk of Court.